# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Amanda Engen, *on behalf of herself and others similarly situated*,

        Plaintiff,

v.

Grocery Delivery E-Services USA Inc. *doing business as* Hello Fresh,

        Defendant.

Case No. 19-cv-2433 (ECT/TNL)

**OPINION AND ORDER**

---

Michael D. Reif and Brenda L. Joly, Robins Kaplan LLP, Minneapolis, MN; Samuel J. Strauss, Turke & Strauss LLP, Madison, WI; and Anthony I. Paronich, Paronich Law, P.C., Hingham, MA, for Plaintiff Amanda Engen and proposed class.

Robert J. Gilbertson and Caitlinrose H. Fisher, Greene Espel PLLP, Minneapolis, MN; and Shannon Z. Petersen and Lisa S. Yun, Sheppard Mullin Richter & Hampton LLP, San Diego, CA, for Defendant Grocery Delivery E-Services USA Inc. d/b/a Hello Fresh.

---

Plaintiff Amanda Engen alleges that telephone calls she received from Defendant Grocery Delivery E-Services USA Inc. ("HelloFresh") in early 2019 violated the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 ("TCPA"). In this case, she seeks injunctive relief and damages on her own behalf and, if certified, on behalf of two nationwide classes of persons who received telephone calls from HelloFresh under like circumstances. HelloFresh has moved to compel individual arbitration of Engen's TCPA claim. HelloFresh says that Engen agreed to the individual arbitration of her claim by creating a HelloFresh account in January 2017 and then, after receiving notice that HelloFresh had revised its Terms and Conditions of use to include arbitration provisions,

returning to HelloFresh's website to use her account once more in January 2019. HelloFresh's motion will be denied because as a matter of law Engen and HelloFresh did not agree to arbitrate disputes.

I

Engen's contractual relationship with HelloFresh began January 21, 2017. Meininghaus Decl. ¶ 4 [ECF No. 31]. That day, Engen "visited HelloFresh's website, created an account, signed up to receive meal-kit delivery service, and placed her first meal-kit delivery order." *Id.* Engen went through several steps to create her HelloFresh account. Zak Decl. ¶¶ 4–5 [ECF No. 32]. She entered her name, address, telephone number, billing address, and delivery instructions. *Id.* ¶ 4. After entering this information, Engen was directed to a "Payment Information" page where she chose her payment method and provided information to enable payment for any charges she incurred. *Id.* Before leaving this page and entering her first order, Engen was required to click a box next to the phrase "I accept the terms and conditions and I have read the privacy policy." *Id.* ¶¶ 4, 5. The words "terms and conditions" were hyperlinked to document entitled "Terms and Conditions of Grocery Delivery E-Services USA INC.," "which were the Terms and Conditions in effect on [that date,] January 21, 2017." *Id.* ¶ 5, Ex. B. Engen then placed a meal kit delivery order. *Id.* ¶ 5; Meininghaus Decl. ¶ 4. This would be the first of only two orders Engen ever placed with HelloFresh and the only one resulting in delivery of a meal kit. *See* Meininghaus Decl. ¶¶ 4–6; Engen Decl. ¶¶ 2–4, 6–8 [ECF No. 39]. After receiving the meal kit, Engen says she "'deactivated'" her subscription. Engen Decl. ¶ 4.

2

The Terms and Conditions in effect on January 21, 2017, were first effective July 7, 2016, Zak Decl. ¶ 5, and they contained no arbitration provision, *see generally id.*, Ex. B. (The Parties refer to these as the "2016 Terms and Conditions," and this Opinion will follow that usage.) Relevant here, the 2016 Terms and Conditions contained the following two terms in a section entitled "**21. OUR RIGHT TO VARY THESE TERMS AND CONDITIONS**":

> 21.1
> We have the right to revise and amend these terms and conditions from time to time to reflect changes in market conditions affecting our business, changes in technology, changes in payment methods, changes in relevant laws and regulatory requirements and changes in our system's capabilities.
>
> 21.2
> You will be subject to the policies and terms and conditions in force at the time that you order Products from us, unless any change to those policies or these terms and conditions is required to be made by law or governmental authority (in which case it will apply to orders previously placed by you), or if we notify you of the change to those policies or these terms and conditions before we send you the Confirmation (in which case we have the right to assume that you have accepted the change to the terms and conditions, unless you notify us to the contrary within seven working days of receipt by you of the Products).

*Id.* § 21.

HelloFresh first added arbitration provisions to its Terms and Conditions effective February 21, 2017. *Id.* ¶ 6, Ex. C § 23. HelloFresh revised or amended the arbitration terms effective June 6, 2018, and this version of the arbitration provisions is at issue here. Meininghaus Decl. ¶ 5, Ex. B § 24. It reads, in relevant part:

> 24.1
> Arbitration is Binding. YOU AND HELLOFRESH ARE AGREEING TO GIVE UP ANY RIGHTS TO LITIGATE CLAIMS IN A COURT OR BEFORE A JURY. OTHER RIGHTS THAT YOU WOULD HAVE IF YOU WENT TO COURT MAY ALSO BE UNAVAILABLE OR MAY BE LIMITED IN ARBITRATION.
>
> ANY CLAIM, DISPUTE, OR CONTROVERSY (WHETHER IN CONTRACT, TORT, OR OTHERWISE, WHETHER PRE-EXISTING, PRESENT, OR FUTURE, AND INCLUDING STATUTORY, CONSUMER PROTECTION, COMMON LAW, INTENTIONAL TORT, INJUNCTIVE, AND EQUITABLE CLAIMS) BETWEEN YOU AND HELLOFRESH ARISING FROM OR RELATING IN ANY WAY TO YOUR PURCHASE OR USE OF PRODUCTS OR OFFERINGS THROUGH THE SITE AND/OR APP, WILL BE RESOLVED EXCLUSIVELY AND FINALLY BY BINDING ARBITRATION.

*Id.*, Ex. B § 24.1. The arbitration provisions that took effect June 6, 2018 also included a class action waiver that reads, in part:

> 24.3
> Waiver of Class Actions & Class Arbitrations. To the fullest extent permitted by law, you agree to arbitration on an individual basis, and to give up any rights to bring, join, or participate in any class action or representative action with respect to any claim, dispute or controversy that you may have against HelloFresh.

*Id.* § 24.3. (Following the Parties convention, the agreement in which these arbitration provisions appear will be referred to as the "2018 Terms and Conditions.")

Engen did not return to the HelloFresh website until January 6, 2019. Meininghaus Decl. ¶ 6. That day, Engen "logged into her account, reactivated her subscription, changed her meal subscription plan, and placed one meal-kit delivery order." *Id.*; *see also* Mem. in Opp'n at 5 [ECF No. 38] (accepting the truth of this assertion). However, Engen canceled

this order later that same day. Engen Decl. ¶ 6. Engen's "credit card never made payment on a 2019 HelloFresh order." *Id.* ¶ 7. Engen and HelloFresh have different accounts of what happened next. Engen says that for "months" she "received repeated calls from HelloFresh" asking her to re-subscribe and purchase meal kits and that she "asked HelloFresh on numerous occasions to stop calling [her]." *Id.* ¶¶ 9–11; *see also* Compl. ¶ 36 ("On two or three occasions, Ms. Engen asked the callers from Hello Fresh [sic] to stop calling her.") These calls are the basis for her TCPA claims in this case. Compl. ¶¶ 33–55. HelloFresh says its "vendors made a total of three calls" to Engen, two in January 2019 and one in March 2019. Fiaschi Decl. ¶¶ 4–5 [ECF No. 29]. According to HelloFresh, Engen did not answer the first call, answered the second but "did not tell HelloFresh to stop calling during [that] call," and answered the third call and "asked HelloFresh to stop calling her." *Id.* ¶ 5. HelloFresh says that in response to this request it "immediately placed [Engen's] phone number on its internal Do-Not-Call ('DNC') list and, based on its records, never called [Engen] again." *Id.*

II

A

A motion to compel arbitration is analyzed either as a motion to dismiss under Federal Rule of Civil Procedure Rule 12(b)(6) or as a motion for summary judgment under Rule 56, depending on how the motion is presented. *Seldin v. Seldin*, 879 F.3d 269, 272 (8th Cir. 2018); *City of Benkelman v. Baseline Eng'g Corp.*, 867 F.3d 875, 881 (8th Cir. 2017). Here, because "matters outside the pleadings" have been presented and considered,

5

the motion "must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d); *see also City of Benkelman*, 867 F.3d at 882.

The Federal Arbitration Act ("FAA") provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The Supreme Court's "cases place it beyond dispute that the FAA was designed to promote arbitration. They have repeatedly described the [FAA] as 'embod[ying] [a] national policy favoring arbitration[.]'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)). Of course, "a party cannot be required to submit to arbitration any dispute which [s]he has not agreed . . . to submit." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582 (1960). "The question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the '*question of arbitrability*,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.'" *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (quoting *AT&T Techs., Inc. v. Commc'n Workers,* 475 U.S. 643, 649 (1986)) (emphasis in original). "[A] matter should not be sent to arbitration unless [1] there is a valid agreement to arbitrate and [2] the underlying dispute falls within the scope of that agreement." *Northport Health Servs. of Ark., LLC v. Posey*, 930 F.3d 1027, 1030 (8th Cir. 2019) (quoting *Telectronics Pacing Sys., Inc. v. Guidant Corp.*, 143 F.3d 428, 433 (8th Cir. 1998)) (cleaned up); *see also 3M Co. v. Amtex Sec., Inc.*, 542 F.3d 1193, 1198 (8th Cir. 2008) (recognizing that a federal court "must grant a motion to compel arbitration if a valid arbitration clause exists

which encompasses the dispute between the parties"). If a genuine dispute of material fact concerning "the making of the arbitration agreement" exists, then a federal district court "shall proceed summarily to the trial thereof." 9 U.S.C. § 4.

As the party seeking to compel arbitration, HelloFresh "carries the burden to prove a valid and enforceable agreement." *Shockley v. PrimeLending*, 929 F.3d 1012, 1017 (8th Cir. 2019). "To determine whether a valid agreement to arbitrate exists," a federal court ordinarily "look[s] to the forum state's contract law[.]" *Northport Health Servs.*, 930 F.3d at 1030 (citing *Barker v. Golf U.S.A., Inc.*, 154 F.3d 788, 791 (8th Cir. 1998)). If the contract in question includes a choice-of-law provision, however, then the state law chosen by that provision controls unless a "persuasive reason [is] advanced" that might justify setting aside the provision. *Barker*, 154 F.3d at 791; *see also Donaldson Co. v. Burroughs Diesel, Inc.*, 581 F.3d 726, 731–36 (8th Cir. 2009) (applying Mississippi law based on contract's choice-of-law provision to determine whether contract's arbitration provision could be enforced by a non-signatory). Here, HelloFresh argues that New York law governs the question of whether there is a valid arbitration agreement because its Terms and Conditions contain a New York choice-of-law provision. Mem. in Supp. at 10–11 [ECF No. 28]; Zak Decl., Ex. B § 22 and Ex. C § 25; Meininghaus Decl., Ex. B § 25. Engen seems to agree that New York law governs whether there is a valid arbitration agreement between her and HelloFresh. She does not argue that the choice-of-law clause is invalid or does not apply here. She cites primarily New York law to support her argument that she has no arbitration agreement with HelloFresh. *See* Mem. in Opp'n at 9–17. She cites cases applying other states' contract law only as persuasive authority—she

does not suggest that any of these authorities are binding or that the state law they apply should control the analysis of whether there is a valid arbitration agreement instead of New York law. Therefore, New York law will be applied here.

Under New York law, ordinary contract principles are applied to determine whether online communications yielded an enforceable agreement. *Scotti v. Tough Mudder Inc.*, 97 N.Y.S.3d 825, 831 (N.Y. Sup. Ct. 2019); *see also Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (applying New York law). "Generally, courts look to the basic elements of the offer and the acceptance to determine whether there is an objective meeting of the minds sufficient to give rise to a binding and enforceable contract." *Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999). "To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Id.* (citation omitted); *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019). "Where an offeree does not have *actual* notice of certain contract terms, he is nevertheless bound by such terms if he is on *inquiry* notice of them and assents to them through conduct that a reasonable person would understand to constitute assent." *Starke*, 913 F.3d at 289. Under New York law, an offeree is on inquiry notice of contract terms if the terms are "obvious" and "called to the offeree's attention," and "[t]his often turns on whether the contract terms were presented to the offeree in a clear and conspicuous way. *Id.* An offeree will be deemed to have knowledge of, and assented to, a website's contract's terms if she is required to "affirmatively acknowledge the agreement before proceeding with use of the website." *Nguyen*, 763 F.3d at 1176. This occurs, for example, when an offeree is required

8

to click on or "check" a box confirming that she has read and agrees to a website's terms and conditions before using the website. *Id.* at 1176–77 (citing *Zaltz v. JDATE*, 952 F. Supp. 2d 439, 451–52 (E.D.N.Y. 2013)); *see also Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 25 (2d Cir. 2010) ("[I]n the context of agreements made over the internet, New York courts find that binding contracts are made when the user takes some action demonstrating that they have at least constructive knowledge of the terms of the agreement, from which knowledge a court can infer acceptance."). Short of that, an offeree also may be deemed to have assented to a website's contract's terms "where the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound." *Nguyen*, 763 F.3d at 1177. For this notice to be effective, however, it cannot be "buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it." *Id.* "[W]here the purported assent is largely passive, the contract-formation question will often turn on whether a reasonably prudent offeree would be on notice of the term at issue." *Sultan v. Coinbase, Inc.*, 354 F. Supp. 3d 156, 159 (E.D.N.Y. 2019) (quoting *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 120 (2d Cir. 2012)).

B

HelloFresh contends that Engen and it agreed to arbitrate disputes, and its argument proceeds in four parts: (1) Engen accepted HelloFresh's 2016 Terms and Conditions when she signed up and placed her first order on January 21, 2017, Mem. in Supp. at 11; (2) the 2016 Terms and Conditions included a provision that allowed HelloFresh to unilaterally modify the Terms and Conditions to include arbitration provisions, Mem. in Supp. at 12; (3) emails HelloFresh sent Engen between February 2017 and January 2019 gave Engen

9

"actual, or at least constructive notice" of the modified Terms and Conditions including the arbitration provisions, Mem. in Supp. at 12; and (4) "[p]ursuant to the modification clause in the 2016 Terms and Conditions, [Engen] agreed to the 2018 Terms and Conditions by reactivating her subscription and placing the meal-kit subscription order" in January 2019, Mem. in Supp. at 13–14. HelloFresh acknowledges that establishing Engen's assent to the arbitration provisions in the 2018 Terms and Conditions depends on HelloFresh establishing each of these four steps—HelloFresh conceded at the hearing on this motion that it cannot establish Engen's assent to arbitration based only on her January 2019 website visit. Engen seems to agree that she accepted HelloFresh's 2016 Terms and Conditions during her January 2017 visit to HelloFresh's website, but she disagrees with the rest of HelloFresh's argument. She says that the law did not permit HelloFresh to add arbitration provisions to the 2016 Terms and Conditions because that would render her original agreement with HelloFresh illusory. If the arbitration provisions were added lawfully, she argues that HelloFresh did not give her adequate notice of them, and she argues that her January 2019 visit to HelloFresh's website did not manifest her assent to the 2018 Terms and Conditions. Mem. in Opp'n at 10–17.

As a matter of law, Engen and HelloFresh did not agree to arbitrate disputes. It is undisputed that Engen did not agree to arbitrate disputes with HelloFresh during her January 2017 website visit. No doubt Engen assented to the then-effective 2016 Terms and Conditions when she visited HelloFresh's website on January 21, 2017, and placed her first order. On that visit, Engen checked a box next to the phrase "I accept the terms and conditions and I have read the privacy policy," Meininghaus Decl. ¶ 4, and this is enough

to infer her acceptance. *Nguyen*, 763 F.3d at 1176–77; *Hines*, 380 F. App'x at 24–25; *see also Sollinger v. SmileDirectClub, LLC*, No. 19-CV-5977 (JPO), 2020 WL 774135, at *2 (S.D.N.Y. Feb. 18, 2020) (recognizing that "clickwrap" agreements create valid contracts under New York law). However, as noted earlier, the 2016 Terms and Conditions had no arbitration provisions. Zak Decl., Ex. B.

If Engen's contractual relationship with HelloFresh endured after January 2017,[1] it is true the 2016 Terms and Conditions to which Engen assented lawfully reserved to HelloFresh "the right to revise and amend [its] terms and conditions from time to time," and provided that Engen would "be subject to the policies and terms and conditions in force at the time [she] order[s] Products from [HelloFresh]." Zak Decl., Ex. B § 21. As HelloFresh points out, there's nothing inherently wrong with a unilateral modification

---

[1] Whether Engen's contractual relationship with HelloFresh continued after January 2017 is not clear on the current record, and it may be the subject of genuine dispute. Engen says that she "'deactivated'" her HelloFresh subscription "terminating [her] relationship with HelloFresh in or around late January 2017." Engen Decl. ¶ 4. The factual basis for this assertion is not provided. The Terms and Conditions in effect in January 2017 described a process to deactivate a HelloFresh account, Zak Decl., Ex. B § 6.3., but there is no record evidence suggesting Engen followed that process. If Engen is understood to testify that her contract with HelloFresh "terminated," that would seem to be a legal conclusion that must be disregarded. Fed. R. Civ. P. 56(c)(4); *Howard v. Columbia Pub. Sch. Dist.*, 363 F.3d 797, 801 (8th Cir. 2004). HelloFresh agrees that Engen deactivated her account, or at least that's what HelloFresh seems to be doing when it acknowledges that Engen had to "reactivate" her subscription when she next visited HelloFresh's website in January 2019. Mem. in Supp. at 13 (describing that Engen "reactivated her subscription") [ECF No. 28]; Reply Mem. at 9 (Engen "reactivated her account") [ECF No. 41]. At the hearing on this motion, however, HelloFresh made clear that its position is that its contract with Engen did not terminate in January 2017. Neither Engen nor HelloFresh have cited, and research has not disclosed, authorities that might resolve on this record whether Engen's contractual relationship with HelloFresh terminated in January 2017.

clause under New York Law. "Under New York law, a contract is not illusory merely because its terms give discretion to one party to the contract, *see Lee v. Joseph E. Seagram & Sons, Inc.*, 552 F.2d 447, 454 (2d Cir.1977) (citing *Wood v. Lucy, Lady Duff–Gordon*, 222 N.Y. 88, 90–91, 118 N.E. 214 (1917)), as every contract encompasses the implied duty of good faith and fair dealing." *Lebowitz v. Dow Jones & Co.*, 508 F. App'x 83, 84 (2d Cir. 2013). "New York courts consider whether a defendant's behavior is reasonable before finding a contract illusory." *Id.* at 84–85. Engen cites no New York authority or facts tending to show that HelloFresh acted unreasonably when it amended the 2016 Terms and Conditions to include arbitration provisions. Engen cites *Nat'l Fed'n of the Blind v. Container Store, Inc.*, 904 F.3d 70, 86–87 (1st Cir. 2018), for the rule that "[a]n alleged contract whose terms can change at a later time based on unilateral action of one party is a text-book definition of an illusory contract." Mem. in Opp'n at 12. But the case is inapposite. In *Nat'l Fed'n of the Blind*, the First Circuit applied Texas law to decide that a modification provision rendered a contract illusory. 904 F.3d at 86–87. Importantly, the First Circuit acknowledged that jurisdictions other than Texas "have recognized that the duty of good faith and fair dealing 'limits the authority of [a contracting] party retaining discretion under the contract' and that this alone 'is enough to avoid the finding of an illusory promise.'" *Id.* (quoting *Fagerstrom v. Amazon.com, Inc.*, 141 F.Supp.3d 1051, 1066 (S.D. Cal. 2015)). New York falls in that category. Engen also argues that HelloFresh's addition of arbitration terms violated the 2016 Terms and Conditions' modification provisions. The modification provisions gave HelloFresh the "right to revise and amend these terms and conditions from time to time to reflect changes in market

12

conditions affecting our business, changes in technology, changes in payment methods, changes in relevant laws and regulatory requirements and changes in our system's capabilities." Zak Decl. Ex. B § 21.1. Engen argues that "[t]hese limited allowed reasons gave HelloFresh no right to unilaterally amend the terms require binding arbitration – a change well outside of" the allowed reasons. Mem. in Opp'n at 11. This is not persuasive. Engen cites no authority to support this argument. HelloFresh says that it added arbitration provisions to its Terms and Conditions in view of evolving law and business needs, Reply Mem. at 4–6, and these justifications fit comfortably within the permitted reasons described in § 21.1 of the 2016 Terms and Conditions.[2]

HelloFresh still must show that Engen manifested assent to the 2018 Terms and Conditions and their arbitration provisions, but the record evidence is insufficient as a matter of law to show that she did. HelloFresh does not argue that Engen's acceptance of the 2016 Terms and Conditions and their unilateral modification provisions alone shows her assent to the 2018 Terms and Conditions and their arbitration provisions. Rather, HelloFresh argues that Engen had at least constructive notice of the 2018 Terms and Conditions because "HelloFresh sent [her] *numerous* e-mails after the Terms and Conditions were updated, informing her that 'Use of HelloFresh service and website is

---

[2] HelloFresh cites *Bassett v. Elec. Arts, Inc.* for its holding that "the arbitration provision was not invalid as illusory simply because EA had the unilateral right to modify the agreement." 93 F. Supp. 3d 95, 106 (E.D.N.Y. 2015). In *Bassett*, the agreements at issue included arbitration provisions when the plaintiff first signed up for the defendant's online products and services, *id.* at 104, and "the arbitration provision was never materially changed," *id.* at 106 (quoting Report and Recommendation at 18). Here, by contrast, HelloFresh's 2016 Terms and Conditions contained no arbitration provisions, and the 2016 Terms and Conditions were materially changed to include those provisions.

subject to our Terms of Use,' before she opted to reactivate her account and place a further order on January 6, 2019." Mem. in Supp. at 12. The record shows that HelloFresh sent Engen "over 50 emails" from April 2017 through March 2019 and that every e-mail included a hyperlink "to the version of the Terms and Conditions in effect at the time of the email." Meininghaus Decl. ¶ 5. HelloFresh has filed with its motion one of these emails that it says Engen "opened to review." *Id.* ¶ 5, Ex. A. As a matter of law, however, this email and others like it do not show that Engen received sufficient notice of or assented to the 2018 Terms and Conditions or their arbitration provisions. The email was not sent to inform Engen of modifications to the 2016 Terms and Conditions or the content of the 2018 Terms and Conditions. It was sent to advertise a "$15 OFF . . . CYBER MONDAY TIRED-OF-TURKEY SALE." *Id.* The email does not mention that HelloFresh's Terms and Conditions have been modified. *Id.* It says nothing about the inclusion of arbitration provisions in the Terms and Conditions. *Id.* The email did not call Engen's attention to these issues. *Starke*, 913 F.3d at 289. The single sentence with the "Terms of Use" hyperlink HelloFresh relies on appears in small print at the bottom of the page, beneath the email's main promotional content, beneath hyperlinks to download HelloFresh's "app," beneath hyperlinks to HelloFresh's social media sites, and beneath a lengthy disclaimer regarding the promotional offer. *Id.* It is not clear and conspicuous. It is "buried at the bottom of the page," *Nguyen*, 763 F.3d at 1177, where a recipient is not likely to see it and less likely to understand its significance. The email is the sort of promotional message

many individuals receive (perhaps several times) every day.[3] Concluding that a recipient's review of this sort of message shows notice of or assent to hyperlinked terms of use would push New York contract law too far. HelloFresh cites several cases for the proposition that a customer's continued use of a website after learning of revised usage terms establishes the customer's acceptance of the revised terms. These cases support the conclusion that Engen did not receive notice of or assent to the 2018 Terms and Conditions or their arbitration provisions. In *Kai Peng v. Uber Techs., Inc.*, Mem. in Supp. at 12–13, the plaintiffs, Uber drivers, received and assented to revisions to Uber's service agreements through a "clickwrap" process—they were not allowed to continue as Uber drivers unless they clicked on a button agreeing to Uber's revised contracts. 237 F. Supp. 3d 36, 44, 47–48 (E.D.N.Y. 2017). Engen's situation is different. She received no similar notice, and she was not required to click a button or undertake any similarly affirmative act to signal assent during her January 2019 visit to HelloFresh's website. In *Sacchi v. Verizon Online LLC*, Mem. in Supp. at 13, the plaintiff, a Verizon customer, received an email informing him of amendments to Verizon's terms of service. No. 14-cv-423-RA, 2015 WL 765940, at *3 (S.D.N.Y. Feb. 23, 2015). "The subject of the email read 'Notice of Revised Verizon Terms of Service.'" *Id.* The email communicated explicitly that "[T]he terms now require that you and Verizon resolve disputes only by arbitration or in small claims court," and that

---

[3] HelloFresh has not submitted other emails it sent Engen, so it seems safe to infer that they are similar. Though HelloFresh identifies the number of emails it sent Engen—"over 50," Meininghaus Decl.¶ 5—it cites no authority suggesting that a larger quantity of emails may show assent where one does not. Not that it matters, but it seems just as reasonable to infer that a larger number of emails might have the opposite effect.

15

a customer would, "[b]y continuing to use the services after the date of this notice, . . . accept and agree to abide by the revised terms." *Id.* Identical information was included in a billing statement sent to the plaintiff. *Id.* The email described in *Sacchi* is very different from the emails Engen received. The purpose of the email in *Sacchi* was to notify customers of the revised terms of service. The email Engen received did not serve that purpose—it was promotional. The email in *Sacchi* mentioned the addition of an arbitration clause explicitly, and it described how a customer's continued use would bind him to the revised terms. HelloFresh's emails to Engen did neither of these things. Finally, in *Olsen v. Charter Commc'ns, Inc.*, Mem. in Supp. at 13, the court determined the plaintiffs were on inquiry notice of the defendant's updated terms of service because billing statements sent by the defendant contained a "sufficiently conspicuous" notice "located in the middle of the front page of the billing statement," partially bolded and sized in approximately twelve-point font. Nos. 18cv3388 (JGK), 18cv4972 (JGK), 2019 WL 3779190, at *5 (S.D.N.Y. Aug. 9, 2019). The emails Engen received were very different. They included no notice of changes to HelloFresh's Terms and Conditions, and that portion of the emails HelloFresh says presented Engen with an opportunity to review the Terms and Conditions appeared inconspicuously at the bottom of the message in small print.[4]

---

[4] As noted, HelloFresh acknowledges that Engen's January 6, 2019 visit to its website cannot alone show that she had notice of or assented to the 2018 Terms and Conditions. This makes sense. As far as the record shows, that visit did not require Engen to affirmatively acknowledge HelloFresh's Terms and Conditions through a clickwrap or similar feature, and no record evidence suggests that the visit placed her on inquiry notice of the 2018 Terms and Conditions.

*

The determination that as a matter of law Engen and HelloFresh did not agree to arbitrate means that HelloFresh's motion to compel arbitration must be denied and makes it unnecessary to consider whether Engen's TCPA claims fall within the scope of an arbitration agreement.

**ORDER**

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS ORDERED THAT** Defendant Grocery Delivery E-Services USA Inc.'s motion to compel arbitration and stay proceedings [ECF No. 26] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  April 10, 2020               s/ Eric C. Tostrud
                                     Eric C. Tostrud
                                     United States District Court